PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

HICKS WILLIAM HELTON, d/b/a B & H Video,
> *Plaintiff-Appellee,*

v.

JEFF HUNT, Rutherford County District Attorney,
> *Defendant-Appellant,*

and

DANIEL J. GOOD, Sheriff of Rutherford County,
> *Defendant.*

No. 02-1853

HICKS WILLIAM HELTON, d/b/a B & H Video,
> *Plaintiff-Appellee,*

v.

DANIEL J. GOOD, Sheriff of Rutherford County,
> *Defendant-Appellant,*

and

JEFF HUNT, Rutherford County District Attorney,
> *Defendant.*

No. 02-1890

Appeals from the United States District Court
for the Western District of North Carolina, at Asheville.
Lacy H. Thornburg, District Judge.
(CA-01-288-1-T)

Argued: April 2, 2003

Decided: May 27, 2003

Before WILKINSON, NIEMEYER, and WILLIAMS,
Circuit Judges.

---

Affirmed in part and reversed in part by published opinion. Judge Wilkinson wrote the opinion, in which Judge Williams joined. Judge Niemeyer wrote an opinion concurring in parts I and II and dissenting from parts III and IV.

---

## COUNSEL

**ARGUED:** Scott Douglas MacLatchie, WOMBLE, CARLYLE, SANDRIDGE & RICE, Charlotte, North Carolina; John Julian Aldridge, III, Special Deputy Attorney General, Raleigh, North Carolina, for Appellants. Luther Donald Starling, Jr., DAUGHTRY, WOODARD, LAWRENCE & STARLING, Smithfield, North Carolina, for Appellee. **ON BRIEF:** Isaac T. Avery, III, Special Deputy Attorney General, Raleigh, North Carolina, for Appellants.

---

## OPINION

WILKINSON, Circuit Judge:

In response to a South Carolina law banning video gaming machines from that state, North Carolina amended its gambling statutes to prevent an influx of machines from South Carolina. The revised statutes made the operation of certain machines illegal unless exempted by a grandfather clause under the statute. The statutes also authorized the immediate destruction of any unlawful machines.

Plaintiff Hicks Helton owned and operated machines which became unlawful under the statute. Helton filed a complaint challeng-

ing the constitutionality of the statutes. He argued that N.C. Gen. Stat. § 14-306.1, which bans the operation of video gaming machines in North Carolina unless the owner can establish that the machines were in lawful operation before June 30, 2000 and registered for ad valorem taxation by January 31, 2000, violates equal protection. Helton further argued that § 14-298, which authorizes all sheriffs and officers to immediately destroy any allegedly illegal machine by every means within their power, violates due process. We reverse the district court's holding that § 14-306.1 violates equal protection, but uphold its decision that § 14-298 violates due process.

I.

On July 2, 1999, South Carolina enacted a law, effective July 1, 2000, banning all vending, slot, and video gaming machines. *See* S.C. Code Ann. § 12-21-2710 (2000). Fearing that the ban would cause an influx of machines from South Carolina, the North Carolina General Assembly amended portions of the North Carolina criminal code to ban certain "slot machines and other devices." *See* N.C. Sess. Laws 2000-151. Section 14-306.1(a) makes it unlawful to "operate, allow to be operated, place into operation, or keep in . . . possession for the purpose of operation any video gaming machine as defined [in the section]." N.C. Gen. Stat. § 14-306.1(a) (2001).

The statute does not ban all video gaming machines, however. Section 14-306.1(a)(1) contains a grandfather clause, exempting from the ban machines that were (1) "[l]awfully in operation, and available for play, within this State on or before June 30, 2000"; and (2) "[l]isted in this State by January 31, 2000 for ad valorem taxation for the 2000-2001 tax year." *Id.* § 14-306.1(a)(1).

The revised statute also makes it unlawful to "warehouse any video gaming machine except in conjunction with the permitted assembly, manufacture, and transportation of such machines," and requires the owner of any video game machine regulated by the statute to register the machine with the Sheriff in the county where the machine is located no later than October 1, 2000. *Id.* § 14-306.1(i), (m). Finally, § 14-298 authorizes and directs all sheriffs and police officers "to destroy [any video gaming machine prohibited by the statutes] by every means in their power" and also authorizes them to "call to their

aid all the good citizens of the county, if necessary, to effect its destruction." *Id.* § 14-298.

Sometime in early 2000, plaintiff Hicks Helton purchased 70 new video gaming machines and put them into operation in Rutherford County, North Carolina. The machines were placed into operation before June 30, 2000, but not listed for ad valorem taxation by January 31, 2000. Helton's machines therefore did not fall under the grandfather clause of the statute and were in violation of § 14-306.1(a).

Helton filed this action in the superior court for Rutherford County, North Carolina, on October 30, 2000, alleging that §§ 14-306.1 and 14-298 violate the United States and North Carolina constitutions. After the original complaint was dismissed as to certain individual defendants who were not proper parties to the action, Helton filed an amended complaint naming Rutherford County Sheriff Daniel Good and Rutherford County District Attorney Jeff Hunt as defendants. The defendants removed the case to federal court in the Western District of North Carolina.

The defendants then moved for summary judgment. On July 5, 2002, the district court denied their motion and granted judgment in favor of Helton. Although the court acknowledged that North Carolina's objective of preventing an influx of machines from South Carolina constituted a legitimate government objective, the court found that the two separate dates under the grandfather clause were not rationally related to that goal. The court also held that § 14-306.1(m) was unconstitutionally vague because it failed to define the term "warehousing." Finally, the court struck down § 14-298 because it permits the seizure and destruction of unregistered machines without any "benefit of notice or an opportunity to be heard."

We review the district court's decision de novo. *McLaughlin v. N.C. Bd. of Elections*, 65 F.3d 1215, 1221 (4th Cir. 1995).

II.

Helton argues that § 14-306.1(a)(1) violates equal protection by treating owners of machines brought into North Carolina after Janu-

ary 31, 2000, differently than owners of machines brought into North Carolina prior to that date. However unequal treatment alone does not constitute an equal protection violation. Lawmaking by its nature requires that legislatures classify, and classifications by their nature advantage some and disadvantage others. Helton correctly asserts that the classification in § 14-306.1(a)(1) treats owners of gambling machines differently based on the date on which the machines were present and operating in North Carolina. Where Helton errs, however, is in the assumption that simply because such a classification seems unfair, it is also unconstitutional. "Defining the class of persons subject to a regulatory requirement - much like classifying governmental beneficiaries - 'inevitably requires that some persons who have an almost equally strong claim to favored treatment be placed on different sides of the line, and the fact [that] the line might have been drawn differently at some points is a matter for legislative, rather than judicial, consideration.'" *FCC v. Beach Communications, Inc.*, 508 U.S. 307, 315-16 (1993) (quoting *United States R.R. Retirement Bd. v. Fritz*, 449 U.S. 166, 179 (1980)).

Given the inherent difficulties in drawing lines and creating classifications, the Supreme Court has accorded legislative enactments a strong presumption of validity so long as they do not discriminate against any protected class or burden any fundamental right. *Id.* at 314. A state's enactment must be upheld "so long as it bears a rational relation to some legitimate end." *Vacco v. Quill*, 521 U.S. 793, 799 (1997) (citation omitted). In other words, where there are "plausible reasons" for the legislature's action, "our inquiry is at an end." *Beach Communications*, 508 U.S. at 313-14 (1993) (quoting *Fritz*, 449 U.S. at 179).

Courts have further recognized that a state has a "paramount interest in the health, welfare, safety, and morals of its citizens." *Johnson v. Collins Entm't Co.*, 199 F.3d 710, 720 (4th Cir. 1999). And because "[t]he regulation of lotteries, betting, poker, and other games of chance touch all of the above aspects of the quality of life of state citizens" the regulation of gambling "lies at the heart of the state's police power." *Id.* It is thus beyond question that North Carolina has a legitimate government interest in the supervision of the video gaming industry.

We also find that § 14-306.1(a)(1) is rationally related to that interest. Even if South Carolina had not enacted a ban creating the potential for an influx of machines into North Carolina, § 14-306.1(a)(1) would survive constitutional scrutiny. Clearly, a state has the power to prohibit gambling altogether. *Posadas de Puerto Rico Assoc. v. Tourism Co. of Puerto Rico*, 478 U.S. 328, 345 (1986). But there is no mandate that a state must address its problems wholesale. Indeed, states are free to regulate by degree, one step at a time, "addressing . . . the phase of the problem which seems most acute to the legislative mind." *Williamson v. Lee Optical Co.*, 348 U.S. 483, 489 (1955). North Carolina has a legitimate interest in restricting the number of new gaming machines in the state as a means of limiting the impact of gambling on the lives of its citizens or as a prelude to banning such a practice altogether. The establishment of two dates — one on which any such machine must have been in operation within the State and the other, earlier date upon which the machine must have been listed on the tax rolls rationally furthers that purpose.

Helton takes particular aim at the requirement that his gambling machines be listed for ad valorem taxation by January 31, 2000, even though they need not have been in lawful operation until June 30, 2000. Since Helton did not purchase his machines until after January 31, the legislature enacted a provision with which he claims he could not possibly comply, despite his full compliance with the June 30 requirement. None of this impugns, however, the rationality of the legislature's scheme. As the State points out, machines entering North Carolina in early 2000 but not registered on the tax rolls were highly likely to be migrating machines. Moreover, those migrating machines, even if brought into North Carolina early enough to satisfy the January 31 requirement, were less likely to satisfy the June 30 lawful operation requirement, which includes a prohibition against machines that disburse cash payouts or merchandise exceeding $10.00. N.C. Gen. Stat. § 14-306, *amended by* § 14-306(b)(2), and (d).

Although the validity of the North Carolina law is not dependent on the existence of the South Carolina ban on video gaming machines, their interconnectedness leaves no doubt as to the rationality of the enactment. The two separate dates under § 14-306.1(a)(1) serve a very specific purpose. The combination of two dates that a machine owner must meet, one for tax enrollment and the other for

lawful operation and use, together work to limit the influx of new machines into North Carolina from south of its border, while protecting longtime video gaming devices. This half-a-loaf approach, while undoubtedly dissatisfying to those disadvantaged by it, is a perfectly rational way of protecting North Carolina's citizens against a quantum increase in gambling activity. We therefore reverse the district court and hold that § 14-306.1 is constitutional.[1]

### III.

We turn next to N.C. Gen. Stat. § 14-298. Helton contends that § 14-298 violates the Fourteenth Amendment by providing for the destruction of video gaming machines without any process whatsoever. Under § 14-298, all sheriffs and police officers are "authorized and directed, on information made to them on oath that any . . . video game machine prohibited to be used by G.S. 14-306 or G.S. 14-306.1, is in the possession or use of any person within the limits of their jurisdiction, to destroy the same by every means in their power; and they shall call to their aid all the good citizens of the county, if necessary, to effect its destruction." N.C. Gen. Stat. § 14-298.

The absence of due process in this provision is apparent. "The constitutional right to be heard is a basic aspect of the duty of government to follow a fair process of decisionmaking when it acts to deprive a person of his possessions." *Fuentes v. Shevin*, 407 U.S. 67, 80 (1972). The due process clause operates to protect the "use and possession of property from arbitrary encroachment — to minimize substantively unfair or mistaken deprivations of property . . . ." *Id.* at 81. The enforcement of § 14-298 leaves machine owners with no protections whatsoever against unfair or mistaken deprivations of their property.

Video gaming machines that are in operation or possessed for the purpose of being put into operation are contraband unless they satisfy

---

[1]Helton also challenges § 14-306.1(m), arguing that it is unconstitutionally vague because it fails to define the term "warehouse." We hold that the term "warehouse" is perfectly accessible to citizens of ordinary intelligence and is not unconstitutionally vague, especially when read in the context of § 14-306.1.

§ 14-306.1(a)(1). Some contraband is "intrinsically illegal in character," *One 1958 Plymouth Sedan v. Pennsylvania*, 380 U.S. 693, 699-700 (1965), and "[c]ourts will not entertain a claim contesting the confiscation of contraband per se because one cannot have a property right in that which is not subject to legal possession." *Cooper v. City of Greenwood*, 904 F.2d 302, 305 (5th Cir. 1990). However, gaming machines are not of such a nature. Under North Carolina law, video gaming machines are not inherently illegal. Possession of a video gaming machine alone does not constitute a crime. Gaming machines are therefore derivative contraband which become unlawful because of their use. *See id.* To be illegal under § 14-306.1(a), a machine must be in operation or possessed for the purpose of being put into operation. N.C. Gen. Stat. § 14-306.1(a). Moreover, the machine must have been put into operation after June 30, 2000, and not listed for ad valorem taxation by January 31, 2000. *Id.* § 14-306.1(a)(1). Machine owners must receive some process to determine whether those conditions apply.

Unlike per se contraband, "a property interest in derivative contraband is not extinguished automatically if the item is put to unlawful use . . . ." *Cooper*, 904 F.2d at 305. Derivative contraband may be subject to forfeiture, but only when authorized by a statute that provides appropriate procedural safeguards. *Id.*; *United States v. Farrell*, 606 F.2d 1341, 1344 (D.C. Cir. 1979). In a case such as this one, where one cannot determine the legality of any given machine by simply viewing its physical properties or the nature of its use, the need for process becomes apparent. A determination of whether a machine was lawfully in operation before June 30, 2000, or listed for taxation by January 31, 2000, may produce questions of fact in any given case. The statute in fact provides no opportunity for the owner of a machine to be heard in court on the lawfulness of its use before the owner's property is destroyed. And although machines complying with § 14-306.1(a)(1) are supposed to be registered with the sheriff no later than October 1, 2000, § 14-298 does not even require that the sheriff or other law enforcement officers consult such registration records before destroying machines they believe to be illegal. In fact, the literal language of the statute actually encourages officers to round up a posse and destroy such machines without consulting any registration records.

Of course states can lawfully ban gaming machines and subject them to forfeiture. Unlike § 14-298, however, the forfeiture statutes of other states provide at least some modicum of process. *See, e.g.*, S.C. Code § 12-21-2712 (any allegedly illegal gaming machine must be seized and immediately taken before a magistrate to determine if the machine is prohibited by statute); 720 Ill. Comp. Stat. 5/28-5 (2003) (devices used unlawfully for gambling subject to seizure but cannot be destroyed unless owner is afforded "a forfeiture hearing to determine whether such property was a gambling device at the time of seizure"); La. R.S. § 15:1356 (2003) (property used in violation of drug racketeering statutes subject to civil forfeiture, but seizure only proper "upon court process," "incident to a lawful arrest or search," or when property subject to seizure was subject of prior judgment based on this Section).

Defendants argue that we should construe the statute as providing due process protections, because the general practice in enforcing § 14-298 is to obtain a court order before any destruction occurs. Whether this is indeed the general practice is not apparent from the record. However, "[t]he canon favoring constructions of statutes to avoid constitutional questions does not license a court to usurp the policymaking and legislative functions of duly elected representatives." *Heckler v. Mathews*, 465 U.S. 728, 741 (1984). Any savings construction here would be at odds with the statute, whose language encourages defiance of, not compliance with, due process guarantees. Although a court will "often strain to construe legislation so as to save it against constitutional attack," *Scales v. United States*, 367 U.S. 203, 211 (1961), it will not do so to the point of "judicially rewriting" the legislation. *Aptheker v. Secretary of State*, 378 U.S. 500, 515 (1964).[2]

---

[2]The statute in question was first passed in 1793. North Carolina appears to suggest that the unusual wording of the provision owes to the statute's antiquity. While this may be so, North Carolina has amended the statute on several occasions and has yet to cure the constitutional difficulties.

The State also suggests that we interpret the phrase "by every means in their power," to prohibit destructions which transgress due process. Combined, however, with the immediately succeeding mandate that officers enlist the aid of a posse, if necessary, to effect the destruction, the words more aptly suggest that an officer is authorized to destroy an allegedly illegal machine by every physical means possible.

We need not go so far in this case to say what kind of process North Carolina must provide to machine owners because § 14-298 authorizes the destruction of machines with no process at all. The district court was correct to conclude that § 14-298 "provides law officers the power to destroy the video game machines without adequate process," and we affirm its judgment.

IV.

For the foregoing reasons, the judgment of the district court is

*AFFIRMED IN PART AND REVERSED IN PART*.

NIEMEYER, Circuit Judge, concurring in part and dissenting in part:

I concur in Parts I and II of the majority opinion and dissent from Parts III and IV. Part II upholds, against an equal protection attack, N.C. Gen. Stat. § 14-306.1, which bans video gaming machines put into use after a specified date. Subsequent sections of the North Carolina statute declare such machines a public nuisance and make their use or possession a crime. But in Part III, the majority concludes that a user or possessor of such contraband video machines is entitled to a hearing before the contraband can be destroyed. Because N.C. Gen. Stat. § 14-298 authorizes a law enforcement officer to destroy prohibited machines without a hearing, the majority finds that it denies owners due process. In reaching that conclusion, the majority assumes, erroneously I believe, that the banned machines are not per se contraband, but "derivative contraband which become unlawful because of their use." *Ante* at 8. I respectfully disagree with the majority's characterization of the North Carolina statute.

North Carolina makes illegal the operating or possessing for the purpose of operating any new video gaming machine that was not "grandfathered in" by registration and operation before certain stated dates. *See* N.C. Gen. Stat. § 14-306.1(a). The same section also prohibits warehousing any such video gaming machines. *Id.* § 14-306.1(h) (formerly § 14-306.1(m)). Section 14-308 then declares the maintenance or keeping of any prohibited machine a "public nuisance," and § 14-309 makes a violation of § 14-306.1, prohibiting the

use and possession of video gaming machines, a crime. Any law enforcement officer, who is provided information on oath that a prohibited video gaming machine exists in the officer's jurisdiction, is authorized to seize and destroy the machine. *Id.* § 14-298.

There can be no doubt that when the use and possession of gaming machines are banned and made illegal, they are per se contraband. *See One 1958 Plymouth Sedan v. Pennsylvania*, 380 U.S. 693, 699 (1965) (defining per se contraband as "objects the possession of which, without more, constitutes a crime").[1] Because North Carolina has made the use, the possession for use, and the warehousing of prohibited video gaming machines illegal and therefore subject to destruction as contraband, I agree with the majority's observation that in such circumstances "courts will not entertain a claim contesting the confiscation of contraband per se because one cannot have a property right in that which is not subject to legal possession." *Ante* at 8 (quotation marks and citation omitted). Contraband does not enjoy the protections of the due process clause. *Id.*; *see also Bennis v. Michigan*, 516 U.S. 442, 447 (1996) (upholding State's forfeiture of innocent owner's automobile used by a third person illegally on a theory that the "thing is here primarily considered as the offender or rather the offence is attached primarily to the thing" (quotation marks and citation omitted)); *id.* at 456 (Thomas, J., concurring) ("[U]nder a different statutory regime, the State might have authorized the destruction of the car instead [of its forfeiture and sale]").[2]

---

[1] The majority, appearing to overlook §§ 14-308 and 14-309, states that "[u]nder North Carolina law, video gaming machines are not inherently illegal [and] [p]ossession of a video gaming machine alone does not constitute a crime." *Ante* at 8.

[2] To be sure, the owner of a *lawful* video gaming machine has a property interest to which attach the usual constitutional and statutory protections. Section 14-298, which authorizes the destruction of only contraband in which one can assert no cognizable property interest, does nothing to diminish the legal protections afforded to one's property interest in a lawful machine. Should a law enforcement officer mistake lawful property for contraband and destroy it under § 14-298, the aggrieved property owner may pursue appropriate remedies for a State's mistaken or unlawful taking and destruction of property. But concern for the hypothetical owner of lawful property who is subjected to a *mistaken* application of § 14-298 is not a basis for casting aside the State's choice to destroy *contraband* without observing procedures afforded to cognizable *property*.

Because the use and possession of banned machines are illegal and their existence is a public nuisance, I would not only uphold the constitutionality of § 14-306.1 but also uphold the constitutionality of § 14-298, which authorizes the destruction of banned machines without a hearing. Accordingly, I would reverse entirely the judgment of the district court.