AGEE, Circuit Judge,
wrote a separate opinion as to Part TV, in which Judge KING concurred in the judgment:
The Equal Protection Clause guarantees that no state shall “deny to any person within its jurisdiction the equal protection of the laws.” U.S. Const, amend. XIV, § l.[13] It does not follow, however, that all classifications are forbidden. Instead, the Equal Protection Clause is designed to “keep[] governmental decisionmakers from treating differently persons who are in all relevant respects alike.” Nordlinger v. Hahn, 505 U.S. 1, 10, 112 S.Ct. 2326, 120 L.Ed.2d 1 (1992). In our view, the district court correctly determined that retired police officers are not similarly situated with the public at large for purposes of the Maryland Firearm Safety Act (“FSA”). Therefore, granting those officers certain rights under the FSA does not violate the Equal Protection Clause.
A.
1.
To succeed on an equal-protection claim, “a plaintiff must first demon *185 strate that he has been treated differently from others with whom he is similarly situated.” Sandlands C & D LLC v. Cnty. of Horry, 737 F.3d 45, 55 (4th Cir.2013). “Generally, in determining whether persons are similarly situated for equal protection purposes, a court must examine all relevant factors.” United States v. Olvis, 97 F.3d 739, 744 (4th Cir.1996) (emphasis added). The court applies an appropriate level of constitutional scrutiny to the challenged governmental act only after the plaintiff makes this initial showing of similarity, along with a showing that the government acted purposefully or intentionally. Sandlands C & D LLC, 737 F.3d at 55.
The “similarly situated” standard requires a plaintiff to identify persons materially identical to him or her who has received different treatment. Different courts describe this requirement in different ways. The Seventh Circuit, for example, has said that the two compared groups must be “identical or directly comparable in all material respects.” LaBella Winnetka, Inc. v. Village of Winnetka, 628 F.3d 937, 942 (7th Cir.2010). The Eleventh Circuit indicates that different groups must be “prima facie identical” to provide the relevant comparison. Grider v. City of Auburn, Ala., 618 F.3d 1240, 1264 (11th Cir.2010). The First Circuit, meanwhile, takes a more colloquial approach, stressing that “apples should be compared to apples.” Barrington Cove Ltd. P’ship v. R.I. Hous. & Mortg. Fin. Corp., 246 F.3d 1, 8 (1st Cir.2001). However the test is written, the basic point is the same: the “evidence must show an extremely high degree of similarity.” Willis v. Town of Marshall, N.C., 275 Fed.Appx. 227, 233 (4th Cir.2008); see also LaBella, 628 F.3d at 942 (“The similarly situated analysis is not a precise formula, but ... what is clear is that similarly situated individuals must be very similar indeed.”).
2.
A retired officer enjoys two privileges under the FSA that the public does not. First, he may possess an “assault weapon” as long as it was “sold or transferred to the [officer] by the law enforcement agency on retirement” or the officer “purchased or obtained” it “for official use with the law enforcement agency before retirement.” Md.Code, Crim. Law § 4-302(7). Second, he is not subject to any of the restrictions on larger-capacity magazines. Id. § 4-305(a)(2).
Exceptions for retired law enforcement officers like these are common in firearms regulations. See, e.g., CaLPenal Code §§ 25450, 26015; D.C.Code § 7-2502.01(a)(2); N.Y. Penal Law § 265.20 e (McKinney 2015); see also Public Safety and Recreational Firearms Use Protection Act, Pub.L. No. 103-322, § 110102(a)(4)(C), 108 Stat. 1796, 1996 (1994) (repealed 2004). But according to Plaintiffs, the differentiation found in Maryland’s law renders the entire FSA unconstitutional. See Opening Br. 44 n. 8.
B..
Plaintiffs argue that, when it comes to owning semiautomatic weapons and larger-capacity magazines, retired law enforcement officers and the public at large are “similarly situated.” In our view, that argument fails because retired law enforcement officers are different from the public in several fundamental respects. Three dissimilarities are particularly relevant.
1.
First, retired police officers possess a unique combination of training and experience related to firearms. See Shew v. Malloy, 994 F.Supp.2d 234, 252 (D.Conn. *186 2014); Pineiro v. Gemme, 937 F.Supp.2d 161, 176 (D.Mass.2013). All Maryland police officers undergo comprehensive training and qualification on their firearms. See Code of Md. Admin. Regs. 12.04.02.03-.10. This training incorporates live-fire exercises and academic study. Moreover, it covers not just how to fire a weapon accurately, but also when a given firearm is appropriately used, how to minimize harm, and how to safely store the firearm— among many other subjects. After initial qualification, officers must then undergo additional training every year.
The officers do not just participate in some “general” form of firearms training. Rather, the officers that carry assault weapons on duty — and thus, those most likely to obtain those weapons upon retirement — must receive further training and certification tests that pertain specifically to those weapons. An officer who wishes to carry an AR-15, for instance, must fire at least 350 rounds of ammunition with that weapon during initial training and qualification. See id. 12.04.02.06B(3)(c). The same officer must also spend at least 14 hours in the classroom discussing the appropriate use of such weapons. See id. 12.04.02.06B(2)(c). If an officer fails to meet any one of these requirements, he may not carry that weapon.
On a day-to-day basis, through their years of employment, police officers gain further practical experience with their weapons — experience that few, if any, private civilians can claim to possess in equal measure. For “[ujnlike most employees in the workforce, peace officers carry firearms because their occupation requires them on occasion to confront people who have no respect either for the officers or for the law.” Gonzalez v. City of Anaheim, 747 F.3d 789, 799 (9th Cir.2014) (Trott, J., dissenting in part and concurring in part); see also United States v. Fernandez, 121 F.3d 777, 780 (1st Cir.1997) (“[Ljaw enforcement officers usually carry weapons[.j”). Indeed, perhaps except for military personnel, police officers likely have more experience with a firearm than any other profession in America.
And retired police officers are eligible to possess prohibited firearms under the FSA only when those firearms come directly from their employer upon retirement. In other words, the FSA does not grant open permission to acquire prohibited firearms at will. The officers will therefore have special familiarity and training with the specific weapons they are permitted to obtain. It is significant that the FSA exceptions for retired police officers contain this clear nexus to their professional law enforcement employment and training.
2.
Second, because they are granted a “special degree of trust,” O’Donnell v. Barry, 148 F.3d 1126, 1135 (D.C.Cir.1998), police officers are instilled with what might be called an unusual ethos of public service. “[Police forces] must demand a high level of discipline and duty of their members in order to function effectively for the good of all members of society.” Vorbeck v. Schnicker, 660 F.2d 1260, 1263 (8th Cir.1981). Officers swear to uphold the law and serve the public from the very start. Indeed, they most often take such an oath on their first day as an officer. Once employed, they agree to “serve mankind,” and “to safeguard lives and property; to protect the innocent against deception; the weak against oppression or intimidation, and the peaceful against violence or disorder.” John Kleinig, The Ethics of Policing 236 (1996) (quoting International Association of Chiefs of Police’s Law Enforcement Code of Ethics); see also Seegmiller v. Laverkin City, 528 F.3d 762, 765 (10th *187 Cir.2008) (describing a law enforcement code of ethics); Thaeter v. Palm Beach Cty. Sheriff's Office, 449 F.3d 1342, 1345-46 (11th Cir.2006) (same).
The officers’ responsibilities go beyond mere pledges and oaths, as the law requires police officers to meet the highest standards of conduct in acting to protect the public. For example, a police officer “owe[s] a fiduciary duty to the public to make governmental decisions in the public’s best interests.” United States v. Woodard, 459 F.3d 1078, 1086 (11th Cir. 2006). Likewise, “police have a duty to protect both the lives and the property of citizens.” United States v. Markland, 635 F.2d 174, 176 (2d Cir.1980). The law then grants officers the authority to arrest, detain, and use force to fulfill these essential responsibilities.
Given these publicly oriented responsibilities, law enforcement officers — retired and active alike — are “not to be equated with a private person engaged in routine public employment or other common occupations of the community.” Foley v. Connelie, 435 U.S. 291, 298, 98 S.Ct. 1067, 55 L.Ed.2d 287 (1978); see also Peña v. Lindley, No. 2:09-CV-01185-KJM-CKD, 2015 WL 854684, at *17 (E.D.Cal. Feb. 26, 2015) (holding that police officers’ charge to protect the public differentiated them from the public); Shew, 994 F.Supp.2d at 252 (same); cf. Detroit Police Officers Ass’n v. City of Detroit, 385 Mich. 519, 190 N.W.2d 97, 98 (1971) (“The police force is a semi-military organization subject at all times to immediate mobilization, which distinguishes this type of employment from every other in the classified service.”). Retired and active police officers are used to acting in the public interest in a way that does not apply to the public at large.
3.
Third, retired police officers face special threats that private citizens do not. Most obviously, “retired law enforcement officers often have to defend themselves ... from criminals whom they have arrested.” H.R. Rep. 108-560, at 4 (2004), reprinted in 2004 U.S.C.C.A.N. 805, 806; see, e.g., Alison Gendar, Ex-Con with Grudge Busted in Bashing, N.Y. Daily News, July 1, 2007, at 13 (“Armed with a grudge and a set of brass knuckles, an ex-con pummeled a retired cop last week as payback for a minor arrest in 2002, authorities said.”). This “greater risk of retaliatory violence,” which continues '“following retirement,” makes law enforcement officers different even from other public employees. In re Wheeler, 433 N.J.Super. 560, 81 A.3d 728, 763 (App.Div.2013); see also Nichols v. Brown, No. CV 11-09916 SJO, 2013 WL 3368922, at *6 (C.D.Cal. July 3, 2013); Mehl v. Blanas, No. Civ. S 03-2682 MCE KHM, slip op. at 11 (E.D.Cal. Sept. 3, 2004) (“While an officer’s duty to respond to the public’s calls for help stops when he retires, the threat of danger from enemies he might have made during his service does not.”); cf. Williams v. Puerto Rico, 910 F.Supp.2d 386, 399 (D.P.R.2012) (noting that current and former government officials have a greater need for firearms because “[t]he sensitive nature of many of their jobs ... subjects them to additional risks of danger”).
What’s more, the same public spirit and sense of civic duty that motivated retired law enforcement officers when they were active might also lead them to intervene more often in dangerous situations in retirement. Just recently, for example, a retired police officer was injured when he allegedly interrupted a robbery at his neighbor’s house. See Matthew J. Coyne, Charges for 2 in Ex-Cop’s Shooting, J. News (Westchester, N.Y.), July 15, 2015, at Al. Other examples are easy to find. See, e.g., Kevin K. Ivesmillard, Cops: Evi *188 dence Doesn’t Support Teen Burglar’s Account of How He Was Shot, Daily Commercial (Leesburg, Fla.), Aug. 12, 2015, at A1 (describing a retired police officer’s shooting of a burglar who allegedly attacked him); Andrew Dys, Suspect Linked to Chester Councilman’s Killing Pleads Guilty to Drug Charge, Herald (Rock Hill, S.C.), Mar. 17, 2015, at 521 (describing how a retired police officer was allegedly shot after he followed gang members en route to a robbery).
Hi Hí Hí H* H* Hí
Thus, in light of their special training, their extensive experience, their commitment to public service, and their unique need for protection in the face of post-retirement violence, retired law enforcement officers are not similarly situated to other Maryland citizens. That should end the equal-protection analysis. See Brown v. Montoya, 662 F.3d 1152, 1173 (10th Cir.2011) (“[T]o assert a viable equal protection claim, plaintiffs must first make a threshold showing that they were treated differently from others who were similarly situated to them.”).
C.
Chief Judge Traxler, in dissent on this issue, concedes that retired police officers are not similarly situated, but nonetheless deems that fact irrelevant — positing that the differences between retired officers and private citizens are not sufficiently tied to the FSA’s perceived objectives to be decisive. Plaintiffs never made this sort of argument; they argued instead that retired police and private citizens are equally well-trained and, consequently, similarly situated. The dissent also focuses on a characteristic that Plaintiffs never discuss: the “responsibility or authority ... to protect” that a retired police officer can (or cannot) be said to possess. But even if Plaintiffs had pressed such a position, we should not embrace it.
1.
When passed, the FSA had a number of objectives. Among other things, it sought to “keep guns away from criminals” and lower the rate of gun deaths from incidents like “murders, suicides, and accidents,” all while “protecting] legal gun ownership.” See J.A. 1183-84. It did so by amending or repealing 31 separate sections of the Maryland Code covering matters as diverse as hunting areas, mental health, police training, and state record-keeping requirements. See 2013 Md. Laws Ch. 427. The sheer breadth of the legislation makes it obvious that the legislation was meant to balance many, sometimes-competing objectives.
The provisions permitting retired officers to obtain restricted firearms and magazines are directly related to these broad objectives. Police officers’ experience and training makes it less likely that retired officers will harm others through the unskilled use of their firearms. See Shew, 994 F.Supp.2d at 252; Pineiro, 937 F.Supp.2d at 176. Given their years in public service, retired police officers would also be more likely use their firearms in ways consistent with the public’s interests, not simply private ones. Retired police officers would further be expected to exercise special care to ensure that their firearms and magazines are not acquired for criminal purposes. And permitting retired police officers these particular firearms and magazines could deter the unique retaliatory violence that only those officers face. Thus, retired police officers have “distinguishing characteristics relevant to the interests” that Maryland intended to serve in enacting the FSA. City of Cle-burne, Tex. v. Cleburne Living Ctr., 473 *189 U.S. 432, 441, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985).
2.
In finding to the contrary, the dissent defines the FSA’s legislative objectives too narrowly. It assumes that the General Assembly intended the Act to eliminate all of the restricted weapons, such that most any exception to a wholesale ban would be inconsistent with that objective (regardless of the characteristics of those who stand to benefit). But the General Assembly’s intent seems more nuanced than that: to limit the prevalence of purportedly dangerous firearms and magazines except in those instances where (1) certain facts ameliorated the expected harms from the restricted items, or (2) other public interests justified the continuing risk.
This approach is entirely acceptable under the Equal Protection Clause. “[T]here is no mandate that a state must address its problems wholesale.” Helton v. Hunt, 330 F.3d 242, 246 (4th Cir.2003); accord FCC v. Beach Commc’ns, Inc., 508 U.S. 307, 316, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993) (“[T]he legislature must be allowed leeway to approach a perceived problem incrementally.”). “[S]tates are free to regulate by degree, one step at a time, addressing the phase of the problem which seems most acute to the legislative mind.” Helton, 330 F.3d at 246; accord Williamson v. Lee Optical of Okla. Inc., 348 U.S. 483, 489, 75 S.Ct. 461, 99 L.Ed. 563 (1955) (“Evils in the same field may be of different dimensions and proportions, requiring different remedies. Or so the legislature may think.”). The FSA is more appropriately characterized as such a step-by-step attempt.
The dissent also casts its lot with the Ninth Circuit, resting much of its analysis on an abrogated decision from that court, Silveira v. Lockyer, 312 F.3d 1052 (9th Cir.2002), abrogated by District of Columbia v. Heller, 554 U.S. 570, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008). But Silveira never engaged with the question before us, namely, whether retired police officers are “similarly situated” to private citizens. Instead, the Ninth Circuit ignored that threshold issue and jumped straight to rational-basis review of a California statute that granted retired police the right to carry semi-automatic weapons despite a ban. See Silveira, 312 F.3d at 1090-91. The Ninth Circuit then established the California statute’s objectives by relying on legislative history and public statements specific to that statute, all of which indicated that the California law was intended to “eliminate the availability of the [restricted] weapons generally.” Id. at 1091. In contrast, the record here contains no evidence that the Maryland General Assembly had any similarly prohibitionist intent.
Most fundamentally, Silveira appears to have been animated by a hostility toward so-called “assault weapons” in general. Id. (holding that there is no “legitimate state interest” in permitting retired police officers — and apparently anyone — to “possess and use” “military-style weapons” “for their personal pleasure”); cf. Nordyke v. King, 319 F.3d 1185, 1192 n. 4 (9th Cir.2003) (criticizing “the Silveira panel’s unnecessary historical disquisition” in which it “took it upon itself’ to advance a limited reading of the Second Amendment). Silveira’s equal-protection analysis should be put aside as a legally unsound and factually distinguishable discussion that lacks any persuasive authority.
D.
For all these reasons, we affirm the district court’s decision on the equal-protection issue. Retired police officers and the public are not similarly situated, and *190 dissimilar treatment of these dissimilar groups does not violate the Equal Protection Clause.
TRAXLER, Chief Judge,
wrote the opinion for the court as to Parts V and VI, in which Judge AGEE joined:
V. Vagueness
Finally, Plaintiffs contend that the FSA is unconstitutionally vague on its face because it is not drafted with sufficient clarity to allow an ordinary citizen to understand when a firearm qualifies as a “copy” of a banned semi-automatic rifle. As previously explained, the FSA prohibits possession of “assault long guns,” which are defined by reference to the list of specific “assault weapons or their copies” set forth in § 5-101(r)(2). The statute does not define the term “copies,” and there' is no state regulatory definition. The FSA has not been enforced against Plaintiffs, and they do not claim that they were forced to forego their Second Amendment rights because they were uncertain whether weapons they wished to acquire were prohibited. Nonetheless, Plaintiffs ask us to invalidate this portion of the FSA under the Due Process Clause.
“Due process requires that a criminal statute provide adequate notice to a person of ordinary intelligence that his contemplated conduct is illegal, for no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed.” United States v. Sun, 278 F.3d 302, 309 (4th Cir.2002) (internal quotation marks omitted). “[T]he void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement.” Kolender v. Lawson, 461 U.S. 352, 357, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983); see United States v. McLamb, 985 F.2d 1284, 1291 (4th Cir.1993). Our task is to determine “whether the government’s policy is set out in terms that the ordinary person exercising ordinary common sense can sufficiently understand and comply with.” Imaginary Images, Inc. v. Evans, 612 F.3d 736, 749 (4th Cir.2010) (internal quotation marks omitted). In order to succeed on a vagueness challenge, therefore, a litigant must “prove that the enactment is vague not in the sense that it requires a person to conform his conduct to an imprecise but comprehensible normative standard, but rather in the sense that no standard of conduct is specified at all.” Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 495 n. 7, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982). Put another way, he must demonstrate that the “provision simply has no core.” Id. (internal quotation marks omitted).
The State urges us to apply the rule set forth in United States v. Salerno, requiring Plaintiffs to establish that “no set of circumstances exists under which the Act would be valid.” 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987). We have noted previously that the continuing validity of the “no set of circumstances” formulation is unclear, see United States v. Comstock, 627 F.3d 513, 518 (4th Cir.2010), and our concern was validated further in the Supreme Court’s recent decision in Johnson v. United States, — U.S. —, 135 S.Ct. 2551, 2561, 192 L.Ed.2d 569 (2015) (“[0]ur holdings squarely contradict the theory that a vague provision is constitutional merely because there is some conduct that clearly falls within the provision’s grasp.”). Regardless, “at the very least, a facial challenge cannot succeed if a statute has a ‘plainly legitimate sweep.’ ” Comstock, 627 F.3d at 518 (quoting Crawford v. Marion *191 Cnty. Election Bd., 553 U.S. 181, 202, 128 S.Ct. 1610, 170 L.Ed.2d 574 (2008); Martin v. Lloyd, 700 F.3d 132, 135 (4th Cir. 2012) (“[A] facial challenge is ineffective if the statute has a plainly legitimate sweep.” (internal quotation marks omitted))).
The phrase “assault weapons and their copies” has a plainly legitimate sweep and is not unconstitutionally vague. Although the Act does not specifically define “copy,” the plain meaning of the word — “something that is or looks exactly or almost exactly like something else: a version of something that is identical or almost identical to the original” — is not beyond the grasp of an ordinary citizen. Merriam-Webster online dictionary. The word is a familiar one in Maryland state law, Md. Code Pub. Safety § 5-101(r)(2), and even federal law, 18 U.S.C. § 921(a)(30)(A)(i) (1994 & Supp. V 1999). When read together with the specific list of prohibited firearms, “copies” is sufficiently definite to give notice to an ordinary person of the conduct that would subject him to criminal sanctions — possession of any firearm that is identical or almost identical to any of the 60-plus semi-automatic rifles listed in the Act is prohibited. Cf. United States v. Fontaine, 697 F.3d 221, 226-27 (3d Cir.2012) (finding that statute prohibiting possession of an imitation firearm during crime of violence was not unconstitutionally vague).
Additionally, in 2010, Maryland’s Attorney General provided guidance on the meaning of “copy” under section 5-101(r)(2) of the Public Safety Code: “[A] copy of a designated assault weapon must be similar in its internal components and function to the designated weapon. Cosmetic similarity to an enumerated assault weapon alone would not bring a weapon within the regulated firearms law.” 95 Op. Att’y Gen. 101. J.A. 678. Following the Attorney General’s issuance of this opinion, the Maryland State Police issued a bulletin indicating that a firearm was subject to regulation under the Act if it was “cosmetically similar to a specifically enumerated assault weapon” and “has completely interchangeable internal components necessary for the full operation and function of any one of the specifically enumerated assault weapons.” J.A. 676.
Plaintiffs argue that the typical gun owner would have no way of knowing whether the internal components of one firearm are interchangeable with the internal components of another. This argument has a commonsense appeal; nonetheless, Plaintiffs have not identified any firearm that they would not risk possessing because of any uncertainty over the meaning of “copies.” Although it is possible to invent “scenarios in which a regulation might be subject to a successful vagueness challenge,” Wag More Dogs, LLC v. Cozart, 680 F.3d 359, 371 (4th Cir.2012), “speculation about possible vagueness in hypothetical situations not before the Court will not support a facial attack on a statute when it is surely valid in the vast majority of its intended applications,” id. (internal quotation marks omitted). It is telling that the weapons that Plaintiffs, according to their own testimony, wish to acquire are all clearly prohibited by the FSA. Section 5 — 101(r)(2) is therefore “surely valid in the vast majority of its intended applications.”
Finally, we note that this same list of “assault weapons or their copies” has been on the books in Maryland for more than 20 years. Although possession of these weapons was not banned prior to passage of the FSA, an individual could not acquire any of the specifically listed “assault weapons” or their “copies” without submitting to a background check. The failure to comply with the regulations was subject to criminal sanctions. Yet, Plaintiffs have not *192 identified, and we are unaware of any instance, where the term “copy” created uncertainty or was challenged as too vague.
We reject Plaintiffs’ vagueness argument. A statute need only have a “legitimate sweep,” Martin, 700 F.3d at 135, that identifies a “core” of prohibited conduct, Hoffman Estates, 455 U.S. at 495 n. 7,102 S.Ct. 1186. “A failure by a statute to define all of its terms does not necessarily render it impermissibly vague,” Centro Tepeyac v. Montgomery Cnty., 722 F.3d 184, 191 n. 4 (4th Cir.2013), and a “statute need not spell out every possible factual scenario with celestial precision to avoid being struck down on vagueness grounds,” United States v. Hager, 721 F.3d 167, 183 (4th Cir.2013). In short, “[v]agueness review is quite deferential.” United States v. Runyon, 707 F.3d 475, 502 (4th Cir.2013). The challenged provisions of the Act sufficiently demarcate a core of prohibited conduct under the Act to survive that deferential test.
VI.
To sum up, the panel vacates the district court’s summary judgment order on Plaintiffs’ Second Amendment claims and remands for the district court to apply strict scrutiny. The panel affirms the district court’s summary judgment order on Plaintiffs’ Equal Protection claim with respect to the FSA’s exception permitting retired law enforcement officers to possess semiautomatic rifles. Finally, the panel affirms the district court’s conclusion that the FSA is not unconstitutionally vague.

AFFIRMED IN PART, VACATED IN PART, AND REMANDED

. This portion of the opinion omits internal marks, alterations, citations, emphasis, or footnotes from quotations unless otherwise noted.